**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | **Criminal No. 16-cr-10133-PBS** |
| | **)** | |
| **BARRY DAVIS** | **)** | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Mr. Davis has pled guilty to six counts of sex trafficking by force, fraud or coercion and transportation for purposes of prostitution related to his involvement with three adult prostitutes in 2015. He now stands to be sentenced for a significant amount of time in federal prison for these offenses. For the reasons set forth below, Mr. Davis argues that the guidelines call for a sentence of 210-262 months, but that a sentence of 15 years is sufficient punishment for these crimes when all of the relevant factors found in 18 U.S.C. §3553(a) are taken into account.

I.      THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

II.      THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Barry Davis has pled guilty to the trafficking of three adult women in 2015. To the extent the

government, and probation, alleges that he should be sentenced for conduct that goes beyond

those events, he objects and denies those accusations. The conduct before the Court relate to two

trips Mr. Davis took, one in April 2015 and one in August 2015, to out-of-state hotels. In both

trips, he went with three different women. Of the three women he went to New Jersey with in

April 2015, one is considered a victim (C.D.). Of the three women he to Connecticut with in

August 2015, two are considered victims (T.B. and A.Z.). All of these women were addicted to

heroin before they ever knew Mr. Davis, and most of them were already working as prostitutes.

He promised them each a supply of drugs in exchange for the money they earned from

prostitution, and each agreed to go with him on these trips for that reason. Most of these women

continued their use of heroin and other drugs even after Mr. Davis was arrested and incarcerated.

One, A.Z., died of an overdose this past summer after Mr. Davis pled guilty. Others, like T.B., have been arrested numerous times since Mr. Davis has been incarcerated, including on charges of prostitution.

Mr. Davis was arrested in August 2015 when police located him and victims T.B. and A.Z. in a hotel in Connecticut. A third woman that had travelled from Massachusetts to Connecticut with T.B., A.Z., and Mr. Davis was in another nearby hotel, and is not alleged to be a victim of human trafficking, although she was admittedly there to earn money through prostitution. Mr. Davis knew A.Z. before this trip to Connecticut. He met her at a time when she was prostituting herself, via ads she placed online, to earn money to buy drugs. Mr. Davis promised to supply her with the drugs she needed and to put her up in hotels so that she could earn money by prostituting herself to pay for the drugs. She accepted this offer and did work for Mr. Davis in various hotels in Massachusetts and Connecticut for a period of time. Mr. Davis did use violence at times towards A.Z., but denies ever forcing her to have sex with him, or withholding her personal phone, food, and/or clothes from her.

A.Z. stopped working for Mr. Davis for a period of time. In August 2015, she went to a detox in Tewksbury, MA where she met T.B. Both were admitted on August 21, 2015 to get treatment for their heroin addictions. On their second day at the facility, A.Z. reached out to Mr. Davis and asked him to pick her, T.B. and a third woman[1] up from the detox, which he did. He supplied them with drugs for a number of days and then picked them up to drive them to Connecticut with another woman, K.L., so that they could earn money through prostitution to continue to fund

---

1 That third woman also got a ride from Mr. Davis along with T.B. and A.Z. but left at some point before T.B. and A.Z. travelled to Connecticut with Mr. Davis because she did not want to go to Connecticut.

their drug habits. According to A.Z., the purpose of the trip was "to make a lot of money." Although T.B. claims she did not know they were going to Connecticut to prostitute themselves, both A.Z. and K.L. have said otherwise. Records from the Motel 6 show that they arrived on August 25, 2015. Mr. Davis told T.B. to watch A.Z. on the first night in Connecticut so she could learn how to prostitute. The second day/night T.B. began taking calls herself and earning money from prostitution. On August 26, 2015, T.B. contacted a male friend in Massachusetts and said she was being held against her will by a pimp. That friend contacted the police, who in turn located T.B. in Connecticut where she was found along with A.Z. Mr. Davis was arrested at that location as well. Mr. Davis had some drugs on him at the time but not enough to continue to supply both A.Z. and T.B. for much longer.

Mr. Davis has remained in custody since August 26, 2015, originally charged and held on human trafficking-like charges in Connecticut state court. Since that time, A.Z. and T.B. have continued to struggle with their addictions. A.Z. died from an overdose in May 2017, after Mr. Davis pled guilty to these offenses. T.B. has been arrested a number of times. In May 2016, she was arrested while walking a section of Dorchester Avenue known for drug activity and prostitution after she offered sex for a fee to an undercover police officer. In June and September 2016, she was arrested by Boston Police for heroin offenses. Just last month, she was arrested for mayhem and assault and battery with a dangerous weapon for stabbing a man.

Counts 8 and 9 related to a trip Mr. Davis took with three women to New Jersey for purposes of engaging them in prostitution. Only one those women, C.D., is admittedly a victim. Mr. Davis met C.D. at a driver's education class. C.D. was visibly "dope sick." Mr. Davis offered her heroin, which she accepted. C.D. later agreed to go with Mr. Davis and two other

women, J.A. and A.B. to New Jersey so that the women could prostitute to earn money for drugs. J.A. had worked for Mr. Davis for a while at that point, and helped him recruit women for prostitution, teach the women how to act with customers, how to post ads, and helped Mr. Davis collect money from the women. J.A. and Mr. Davis have a young child together, the subject of an ongoing Care and Protection case in Boston Juvenile Court that J.A. has not been invo. After a short time in New Jersey, C.D. left the room and called a relative, who in turn called the local police. When the police arrived at the New Jersey hotel, Mr. Davis was not there but C.D., J.A., and A.B. were. Mr. Davis was not charged with any crimes at that time.

The government has provided probation with allegations regarding other women as well. Specifically, the government has described Mr. Davis's relationship with C.G., another heroin addict who worked as a prostitute alongside J.A., mentioned above. The Pre-Sentence Report also contains unproven allegations from 2003 regarding N.S. Those allegations were the subject of a state court prosecution, see PSR ¶56, as a result of which Mr. Davis pled guilty to two counts of indecent assault and battery on a person over 14 and all other charges were dismissed. In this case, the government agreed to dismiss the count related to N.S. as part of the plea agreement. The government also agreed to dismiss counts related to A.O., which contained allegations going back to 2001 that were never made to anyone until federal law enforcement officials in this case began contacting various women that had prior involvement with Mr. Davis. Mr. Davis denies ever prostituting A.O., although he was involved in a relationship with her for a period of time that did involve domestic violence. See PSR ¶54.

III.    THE SENTENCING GUIDELINES

Even though the parties have agreed to recommend a sentence below the guideline sentencing range, the guidelines are always the starting point in determining an appropriate sentence. *Gall v. United States*, 128 S. Ct. 586, 596 (2007) (noting that "the Guidelines should be the starting point and the initial benchmark," but that they "are not the only consideration" … and a judge "may not presume that the Guidelines range is reasonable"). Here, the parties have agreed that the guidelines call for a base offense level of 34, U.S.S.G. §2G1.1(a)(1), a three level upward departure because there are three groups for purposes of U.S.S.G. §3D1.4, and a three-level downward departure for Mr. Davis's acceptance of responsibility. Probation has calculated the offense level at a higher level due to their inclusion of additional alleged victims in determining the offense level. See PSR ¶34. While the statement of offense conduct submitted by the government and relied upon by probation gives the defendant concerns that they will not honor the terms of the plea agreement where they agreed to a guideline calculation that includes only the three victims to which Mr. Davis pled guilty, the defendant argues, and assumes that the government will join him in this argument, that there are only three victims of the offense and that the guideline calculation set forth in the plea agreement in the correct one.[2]

As described above, the three victims in this case represent the charges to which Mr. Davis pled guilty. J.A. was not a victim, but rather a willing participant in prostitution herself, who also helped recruit and train additional women to work for Mr. Davis. Mr. Davis also denies that C.G.

---

2 Based on the statement of offense conduct the government submitted to probation for purposes of preparing the Pre-Sentence Report, their failure to object to the guidelines calculation contained in the Pre-Sentence Report, and communications between defense counsel and counsel for the government, the defense sent a letter to the government reminding them of their obligations pursuant to the plea agreement. A copy of that letter is attached as Exhibit A.

is a "victim," but submits that she was also a willing participant in prostitution activities. Furthermore, Mr. Davis's involvement with C.G. was the subject of a motion in limine in which the Court ruled that any testimony from C.G. should be excluded because it was not relevant to the counts upon which Mr. Davis was to be tried. C.G.'s involvement with Mr. Davis is not related to the counts of conviction here, has not been admitted by Mr. Davis, and is precluded from consideration pursuant to the guidelines calculation agreed-to by the government.

By virtue of including allegations regarding Mr. Davis's involvement with J.A. and C.G. as part of the relevant offense conduct in this case, which allegedly began in 2013, Mr. Davis's criminal history points are also increased. Specifically, probation has added two criminal history points because they allege that Mr. Davis was still on federal supervised release at the time of the offense. Mr. Davis's term of supervised release ended on January 21, 2015. The counts of conviction, which, as stated above, are the only counts that should be counted for purposes of determining the offense level, occurred in April and August 2015. Therefore, Mr. Davis was not on supervised release at the time of the offense and should not receive an additional two criminal history points. Without those two points, Mr. Davis has 12 criminal history points, placing him in criminal history category V.

Counsel for Mr. Davis also objects to probation's opinion that a 2003 conviction falls within the applicable time period and therefore receives three criminal history points. *See* PSR ¶54. This case should not receive criminal history points because ambiguities in the court records make it impossible to determine whether or not this was a sentence of less than 13 months that occurred over ten years from the date of the offense. Mr. Davis originally served 7 months on count 2 of this indictment, while the balance of a 2 ½ year sentence was suspended. Mr. Davis later was

found to be in violation of his probation, the court committed him to jail. The court records, however, do not indicate the length of the VOP sentence. A clerk's note written on the indictment says "1 House" suggesting that the sentence was one year in the house of correction. Mr. Davis's CORI also reflects a one year sentence. These records are attached as Exhibit B. Finally, the fact that Mr. Davis was sentence on 6/10/2004 with 77 days credit and released just five months later on 1/19/2005 (for a total of 301 days) suggests that the court did not impose a sentence that was the full balance of the suspended sentence. In light of these ambiguities, Mr. Davis should not receive criminal history points for this case since it cannot be said for certainty that it falls within the applicable time period under §4A1.2(e).

Accordingly, Mr. Davis submits that the offense level is 34 and the correct criminal history category is IV, resulting in an applicable guideline sentencing range of 210-262 months.[3]

IV.    SENTENCES IMPOSED IN SIMILAR CASES

Under 18 U.S.C. §3553(a)(6), a sentencing court must consider "the need to avoid unwarranted sentence disparities among defendant with similar records who have been found guilty of similar conduct." A sentence of 15 years' imprisonment is consistent with what similar offenders in this district have received for sentences. *See United States v. Darrell Graham*, No. 12-cr-10266-NMG (sentence of 150 months for defendant originally charged with human trafficking allowed to plead to 3 counts of transportation related to prostitution of 19 year old woman he raped and beat); *United States v. Derek Miranda*, No. 15-cr-10196-PBS (sentence of

---

3  At the Rule 11 hearing, the Court asked the government what they believed the applicable guideline sentencing range was. The government indicated that they believed the applicable guideline sentencing range was 188-235 months, if Mr. Davis was found to be in criminal history category III. The government further indicated that if Mr. Davis was found to be a career offender his guideline sentencing range would be 262-327.

57 months where charges of human trafficking a minor were dismissed in exchange for plea to transportation counts); *United States v. David Minasian*, No. 13-cr-10099-WGY (defendant deemed to be a career offender with guideline sentencing range of 262-327 months sentenced to 15 years for sex trafficking of children); *United States v. Michael Gemma*, 12-cr-10155-GAO (defendant sentenced to 20 years *after trial* for sex trafficking a minor); *United States v. Justin Richardson*, 14-cr-10179-NMG-1 (sentence of 138 months for sex trafficking a minor where guidelines were 210-262 months); *United States v. Mark Pinnock*, 14-cr-10179-NMG-2 (sentence of 96 months for sex trafficking a minor); *United States v. Martin Pinkey*, 14-cr-10179-NMG-3 (sentence of 71 months for sex trafficking a minor); *United States v. Cory Norris*, 13-cr-10077-DJC-1 (sentence of 180 months for lead defendant multi-defendant multi-year, multi-victim conspiracy to traffic minors case where guidelines recommended sentence of 324-405 months); *United States v. Anthony Pledger*, No. 14-cr-10036-WGY-1 (sentence of 15 years for sex trafficking children); *United States v. Miriam Kizzie*, 14-cr-10036-WGY-2 (sentence of 153 months for sex trafficking children); *United States v. Jonathan White*, 15-cr-10041-IT (sentence of 10 years for sex trafficking a child); *United States v. Kwamaine Wells*, 16-cr-10003-DJC-1 (sentence of 135 months for multiple counts of transportation where defendant originally charged with sex trafficking by force, fraud, or coercion)*; but see United States v. Raymond Jeffreys*, No. 13-cr-10077-DJC-4 (sentence of 360 months in multi-defendant, multi-year, multi-victim conspiracy to traffic minors case where guidelines were 360-life). Notably, many of these sentences involved cases where minors were being trafficked.

## V.      A SENTENCE THAT FULFILLS THE FOUR NEEDS OF A SENTENCE

While courts must continue to *consider* the sentencing guidelines, the Supreme Court has held that the Court may not presume that that the guideline sentencing range is reasonable, and Congress has *required* federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 128 S.Ct. 558 (2007); *Gall v. United States*, 128 S.Ct. 586 (2007). That sentencing statute dictates that a sentence must fulfill four "needs," which are, put succinctly, punishment, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a)(2). None of these factors listed under the "need" for the sentence in § 3553(a)(2) justify a sentence more than 15 years.

The offense before the Court is serious and warrants a prison term, but 15 years is an incredibly long federal prison term. It is the same type of sentence defendants receive for murder in state court. Although Mr. Davis has served time in prison before, he has never received a punishment anywhere near as severe as the mandatory minimum sentence in this case. The longest term of incarceration that has been imposed upon him was five years, for his prior federal drug case. Plus, it is not just a lengthy prison term that serves to punish Mr. Davis for this offense. These convictions carry with them a number of collateral consequences and stigma. He will also be subject to strict conditions and restrictions on his liberty for a period of at least five years of supervised release.

Such a huge leap in the length of sentence is also a strong deterrent. It is not only long enough to specifically deter Mr. Davis, but also sends a very strong message to the community about the kinds of lengthy sentences people face in federal court for these types of offenses. No one would ever think a fifteen-year sentence is lenient in this situation.

While recidivism is certainly a concern in this case given Mr. Davis's criminal history, the Court should consider that Mr. Davis will be close to or in his 50s when he is released from federal prison. Recidivism rates are widely known to decrease steadily with age, and this is even true for people with criminal histories similar to Mr. Davis's. U.S.S.C., <u>Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines</u>, Exhibit 9, available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (May 2004). Mr. Davis will necessarily be a different person 15 years from now, and by the aging process alone less likely to recidivate.

The sentence must also protect the public from further crimes of the defendant. §3553(a)(2)(C). Removing from society for 15 years, and releasing him only when he is much older, will do that. In addition, Mr. Davis will continue to be supervised by probation for an additional five years (at a minimum) following his release from prison. That supervision will further serve to protect the public.

Fifteen years is also long enough for Mr. Davis to take advantage of whatever programs in the Bureau of Prisons from which he might benefit. However, the Court should also consider that Mr. Davis's last federal prison term did him much more harm than good, as he was housed in a violent penitentiary where he was subjected to violence and abuse. It is doubtful that this prison term will be much better for him. The rehabilitative value of this sentence will be on supervised release, when Mr. Davis can, in a safe environment, participate in counseling and other treatment he needs.

VI.   SUPERVISED RELEASE CONDITIONS

Mr. Davis will be subject to a minimum of five years' supervised release. He asks the

Court to impose a five year term, but objects to the slew of extremely restrictive special

conditions requested by probation. Under 18 U.S.C. §3583(d), the court may order special

conditions of supervised release, only to the extent that such conditions:

> (1) are reasonably related to (a) the nature and circumstances of the offense and the
> history and characteristics of the defendant, (b) are designed to afford adequate
> deterrence to criminal conduct, (c) protect the public from future crimes of the defendant,
> and (d) provide the defendant with needed education or vocational training, medical care,
> or other correctional treatment in the most effective manner;
>
> (2) involve no greater deprivation of liberty than is reasonably necessary for the purposes
> of affording adequate deterrence to criminal conduct, protecting the public from further
> crimes of the defendant, and providing the defendant with needed educational or
> vocational training, medical care, or other correctional treatment in the most effective
> manner; and
>
> (3) are consistent with any pertinent policy statements issued by the Sentencing
> Commission pursuant to 28 U.S.C. 994(a).   *See also* U.S.S.C. §5D1.3(b).

Courts, including the First Circuit, have recently begun to criticize District Courts for not being

more thoughtful in imposing special conditions of probation. For example, in *United States v.*

*Del Valle-Cruz*, the First Circuit vacated conditions of supervised release that prohibited the

defendant from having personal contact and residing with minors. 785 F.3d 48 (1st Cir. 2015).

The Court held that it was a miscarriage of justice for the Court to impose "onerous conditions

without explanation or justification" where those two conditions would interfere with the

defendant's ability to raise his own nine year-old son. *Id.* at 57. The Court found that there was

no relationship between the offense and the presence of a child in the home, or that residing with

a child would increase the defendant's risk of recidivism. *Id.* at 59. The concurring opinion in

17

that case criticized Courts for imposing "harsh and exacting conditions" while neglecting to

provide rationale for their imposition. *Id.* at 65. The Seventh Circuit also recently examined

conditions of supervised release imposed on a number of defendants and vacated the defendants'

sentences and remanded their cases for complete resentencing. *United States v. Kappes et al.*,

782 F.3d 828 (7th Cir. 2015). After doing so, the Court noted that, given the scrutiny under which

the sentencing judge's orders were analyzed by the Appeals Court, "a sentencing judge might be

tempted to conclude that the imposition of discretionary conditions of supervised release is more

trouble than it is worth." *Id.* at 867. The Court said, "perhaps in certain cases, only a small

number of well-tailored discretionary conditions may be all that is necessary to accomplish the

purposes of supervised release. A comparatively small number of conditions might also make

compliance easier on defendants and supervision easier on understaffed probation departments."

*Id.*

Mr. Davis addresses each of the proposed conditions to which he objects in turn:

Proposed Condition 6: Mr. Davis objects to the condition that he be required to
participate in sex offender treatment. Probation has also requested, and Mr. Davis does
not object to, mental health treatment, substance abuse treatment, and a certified
batterer's intervention program. Requiring sex offender treatment as well is overly
burdensome and not warranted given Mr. Davis's history and characteristics. Mr. Davis
has only one prior sex offense, an indecent assault and battery that occurred in 2003. His
involvement in the instant offense is linked to his involvement in street life and drug
dealing, not any sexual disorder that requires treatment.

If the Court does impose this condition, Mr. Davis has a further, specific objection to the
sentence which states that the "sexual specific evaluation may include psychological and
physiological testing which may include polygraph, ABLE screening, and other types of
testing, as approved by the Probation Office."   The phrase "other types of testing" is
overly broad, and given the First Circuit's recent cautionary words about imposing a
condition that the defendant submit to penile plethysmograph (PPG) testing as a type of
"physiological testing" in sex offender treatment, *see United States v. Medina*, 779 F.3d
55 (2015), the Court should limit the types of invasive testing that sex offender treatment

18

involves.   *See also See United States v. McLaurin*, 731 F.3d 258, 2013 U.S. App. LEXIS 20210 at *2-3 (2d Cir. 2013) (holding that plethysmograph testing has no therapeutic benefit, and its accuracy and reliability are questionable).

Proposed Condition 7: Mr. Davis objects to the condition that he be required to submit to polygraph examinations. He is already subject to the standard condition that he answer truthfully all inquiries by probation. He is also required to participate in a variety of therapies. This condition involves an invasive procedure that is not necessary given all the other conditions of supervised release that will be imposed.

Proposed Condition 8: Probation also wants to monitor any of Mr. Davis's computer use to ensure he's not accessing "content of a sexual nature or otherwise inappropriate nature." Monitoring of his computer activity, by itself, is a severe invasion of privacy. While the internet was a tool used by Mr. Davis to post ads for the women he was prostituting, the computer was not the primary means used to commit this crime. It is also far too vague for probation to be allowed to monitor content of "otherwise inappropriate nature." That term is not easily defined and gives the probation essentially no notice of what he can or cannot view online. Probation also seeks not just to monitor his internet use to ensure he is not viewing illegal sexual material, but to monitor any internet use that has to do with sex, legal or not. There is nothing illegal about adult pornography, and a prohibition on legal sexual material, bears no relation to the offense and Mr. Davis's background. Subjecting Mr. Davis's computer use to constant monitoring to be able to see what sexual content he is viewing is not necessary in this particular case.

Proposed Condition 9: Mr. Davis objects to this condition for the same reasons he objects to the other proposed conditions regarding computers. This condition is also a reminder that requiring the installation of monitoring software could also infringe on the liberty interests of innocent third parties living in the defendant's home.

Proposed Condition 10: This condition is an overly broad restriction on Mr. Davis's liberty. It proposes that he not possess or use, or have access to, any internet-capable device or any online service without probation's prior approval. This condition allows probation the discretion to prohibit Mr. Davis's use of computers and/or internet-capable devices entirely. Such a restriction, especially considering the essential role technology plays in everyday life, is too restrictive. It is likely to be even more of an infringement on his liberty interest when he is released from prison. It was for this reason that this same condition was found to be unreasonable in the case of *United States v. Hinkel*, 837 F.3d 111 (1st Cir. 2016). As the First Circuit noted in that opinion, "[a]n undue restriction on internet use renders modern life—in which, for example, the government strongly encourages taxpayers to file their returns electronically, where more and more commerce is conducted on-line, and where vast amounts of government information are communicated via website—exceptionally difficult." 837 F.3d at 126 (internal quotations and citations omitted).

Proposed Condition 11: This condition is also designed to allow probation to monitor Mr. Davis's computer usage by ordering him to give probation all his internet account information, such as usernames and passwords. Given the amount of private information people have on the computer, this condition basically gives the probation officer access to every aspect of Mr. Davis's life. For the same reasons he objects to the other proposed conditions, Mr. Davis objects to this condition as well.

Proposed Condition 12: This condition is a broader version of proposed condition 11, and another means by which probation can police Mr. Davis's computer usage. However, this condition would allow probation to examine "any requested financial information," and thus have access to another private area of Mr. Davis's life. They will be able to examine how and where he spends his money, and that has no relationship to the offense or Mr. Davis's background, and is yet another needless curtailment of his liberty.

Proposed Condition 13: This sweeping restriction prohibits Mr. Davis's contact with children, even though the victims in this offense were all adults. His only offense involving a minor occurred in 2003, and he has had no inappropriate contact with minors since then. *See United States v. Goodwin*, 717 F.3d 511, 523 (7th Cir. 2013) (vacating similar condition of supervised release).

Proposed Condition 15: For the same reasons Mr. Davis objects to the restrictions on his use of computers and to the proposed prohibition of contact with minors, Mr. Davis objects to this condition as well.

Imposing all these restrictions on Mr. Davis when he is released from prison, with no job, an uncertain future, and the mark of being a convicted sex offender, will only further hinder his reintegration into society, isolate him from his community, and continue to punish him beyond his term of incarceration by significantly restricting his freedom. In no other type of offense before this Court would a person with Mr. Davis's background be subject to such a long list of restrictive conditions. These requests come only in cases involving sex offenses. When Mr. Davis is released from prison, he will be monitored by a probation officer and by the local sex offender registry. Every aspect of his private life need not be scrutinized by probation in order to protect the public. The proposed conditions have little to no therapeutic value. They are,

singularly, and even more impressively as a whole, severe restrictions on Mr. Davis's liberty that bear little relationship to his history and the offense before the Court.

## CONCLUSION

For the reasons stated above, a sentence of 15 years' imprisonment followed by five years' supervised release is a sentence that is "sufficient, but not greater than necessary" to comport with the purposes of sentencing in Mr. Davis's case.

Respectfully submitted,
BARRY DAVIS,
By His Attorney,

*/s/Jane Peachy*
Jane Peachy, BBO #661394
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 18, 2017. Unredacted copies of this document will be sent via email to the attorneys for the government on the same date.

*/s/ Jane Peachy*
Jane Peachy